Please be seated. Mr. Philippine. Thank you, Justice Sotomayor. Please, the Court. I am here for the Philippine Bishops of Chicago v. The Village of Libertyville. These are well-established principles of law in the land-use context and also in the land-use context. I think it is important to realize that if activities comply with some laws, but not all applicable laws, those activities are neither lawful nor reasonable. Compliance with all legal requirements is a necessity. In this case, both the plaintiff and the trial court lost sight of this principle. As a result, the trial court's order should be reversed and the denial of the plaintiff's proposal should be upheld.       Please, the Court. I am here for the Philippine Bishops of Chicago v. The Village of Libertyville. Conceded, did he not, that 95% of the time during this peak morning hour traffic there would be three cars or less in the queue, waiting to make a left turn from the subdivision on to Butterfield Road? How is that consistent with Woods' theory that drivers at this intersection might make very poor choices and shoot the gaps irresponsibly and jeopardize their personal safety? Well, Justice, I believe that the analysis that Mr. Woods offered was based on common sense, what practical drivers experience all the time, but that, however, is not the basis ultimately for what the bill has decided. That certainly justified one element of the facts pattern that came up, but ultimately what we're talking about was a decision or a series of decisions by the Village of Liberty Bill. There were four that were challenged here. Three of them were zoning decisions. There was a zoning decision regarding a special use permit, a rezoning, and an approval of a plan development concept plan. There was a fourth decision, and that was the denial of a preliminary plan of subdivision. That was a subdivision denial. The other three are all zoning denials, and it was because of that subdivision denial and the court's failure to recognize the distinction between the zoning denials and the subdivision denials that we find error arising from the trial court's order, and that error is reversible, and I will explain why. Subdivision denial is what is based on the 48% that they're seeking to, I'm sorry, they're proposing to develop, and that preliminary plan of subdivision, which was set forth in the proposal and in the facts, was denied by the Village Board unanimously. Now, planners had asserted before the trial court that the property should be allowed to develop in accordance with the revised development plan, notwithstanding the subdivision denial. But, counsel, let me stop you for a second. That point was never raised to the trial court until the motion to reconsider was presented and actually heard. It was not even in the written motion to reconsider, if I'm understanding the point that you're making now. Isn't that correct? You can't be judged. Pardon? That's probably the case. Yeah. If you look at paragraphs, I believe, two, three, and four of the complaint, as well as Exhibit A to the complaint, the actions that are challenged include the denial of the preliminary plan of subdivision. Well, but there's a trial court's order. I'm sorry to interrupt you. Go ahead. But the trial court's order specifically found that the actions were invalid. They found that the trial court found them unreasonable and arbitrary. The plaintiff brought those into issue. The plaintiff had the burden of going forward on that issue. The plaintiff brought no evidence. We had no obligation to bring any kind of evidence on a point that we have a presumption of validity. So you're not contesting anymore of the zoning issues anymore? Oh, Your Honor, I am. But I believe that, irrespective of the zoning, the failure of a subdivision required reversal of the trial court's order. Didn't, I don't know if it was you who argued the motion to reconsider, but didn't whoever argued the motion to reconsider on behalf of the village say, Judge, although it's not in my motion, I'm going to raise another factor, and then said, but it's not, but it just was not referenced in the motion at all. And when whoever was arguing, we started talking about the denial of the subdivision plan. And if I could just add, before I have the same part of the record in front of me, counsel said, Your Honor, it could be something just on appeal, if there's an appeal done on this case. But it's not referenced in my motion at all. How can we rule on something like that? Well, the motion to reconsider was based on the trial court's order and the rulings on the findings before the trial court. That's what the motion was focused on. But if you look at what the ultimate order was, the ultimate order was to allow this preliminary plan subdivision. The complaint in this case, in its very opening paragraphs, identified the denial of the plan of subdivision, preliminary plan of subdivision, as one of the bases for challenge. That was an issue engaged at the very outset of this case. The fact that at the time the plaintiff didn't ask for mandamus relief with respect to this. Did that? No. We were asking that the subdivision denial, as well as the other zoning relief, all be deemed invalid. And so that was the challenge. Right. It was packaged in. The fact that they packaged it doesn't change the fundamental nature of the relief involved before the village board that they are challenging. But it does let us focus on what the evidence was put forth in this case, which was reference to the traffic issues with respect to the adequacy of the ingress and the egress. And judge me. Not any other shortcomings with respect to the plan of subdivision. The choice of what evidence was presented was that of the plaintiff. It was their burden of going forward. They presented no evidence whatever regarding the appropriateness or not of the subdivision denial. Therefore, we didn't put out any evidence either because we have a presumption of validity as to the subdivision ordinance and our decision denying the preliminary plan subdivision that was facially violative of the terms of our subdivision ordinance. If they don't present anything, we have no obligation to bring anything forward. The motion to reconsider was to reconsider those issues that were addressed in the trial court's order. And that's why the subdivision wasn't placed. But in terms of the actual order that was entered and the issues before the trial court, they turn on the subdivision. Why did they turn on the subdivision? Because the subdivision is the plan on which the zoning has to be approved. As you know, under Illinois zoning law, it's not enough to show that the underlying zoning is unreasonable. You also have to show that you have a plan that is reasonable. Here, the plan that was presented, the revised development plan, does not comply with the subdivision ordinance. On its face, in very material respects, a third of the lots don't front on a proper right-of-way. And the rights-of-way that are there are two and a half times short of what they need to be. This isn't a matter of, oh, the angle needs to be adjusted by 1 percent on this one curve. This is a fundamental problem of their development plan. When you reference that this was in the trial court decision, are you referring to the court's one sentence where it says the Archdiocese proposed development plan reflected in Exhibit 11A subject to reasonable conditions for final approval shall be imposed on the subject property? That, and then you'll see also in the rulings that were made during the motion to reconsider, the court also said that the four ordinances, as he described it, were unreasonable and therefore invalid. Those include the subdivision design. Did you argue below, at the trial level, at the trial court, during the trial, closing arguments on the trial itself, that the plaintiff's petition should be denied because they failed to comply with the subdivision code? What the village argued was that it denied the allegations that the four ordinances or decisions, the four denial decisions, were unreasonable. The issue was made. That brought the case at issue at that point. But what I'm getting at is this. You have a trial judge who's hearing a, what was it, eight-day trial with 15 witnesses, who then takes the time and effort to prepare a 35-page memorandum order that never once mentions the subdivision code, not one time. And that isn't the failure of the village. It isn't. That's the failure of the plaintiff and the trial court. I'm not raising a defense to the petition now that you did not raise below. No. No. This was engaged as an issue from the very outset. Well, if you raised it below, how did the trial judge just miss it? I mean, this trial judge, I mean, I read the – it was a very thoughtful decision who seemed to go through all the evidence and all the arguments. How did the trial judge miss that? Judge, I believe that in the thick of this, with the plaintiff's focus on just the zoning issues, the trial court went down the same path that the plaintiff went. But this case did not have a single path that needed to be satisfied. Both the subdivision requirements and the zoning requirements had to be satisfied. And the plan that they presented plainly violates the subdivision ordinance. So does the trial judge's ruling approve the final plan of subdivision? The court did. I'm sorry. Order. Does the trial judge's ruling order the village to approve this as a final plan of subdivision? Well, as a preliminary plan of subdivision. That is the effect of the court's order. And to do that, the court had to have found that the subdivision denial was unreasonable. And to make that finding, the court had to have found that there was evidence that the subdivision denial was unreasonable. And plaintiff put on not a shred of evidence regarding the subdivision. Doesn't the trial court take care of that by putting in that it's subject to reasonable conditions of final approval, which certainly the – looking at the trial judge's ruling on the motion to reconsider, the trial judge seemed to indicate that these I'm talking about it starts alleys and this and that. Well, I would note a couple of things, Judge, or Justice, excuse me. First, the trial court in the motion to reconsider specifically found that the subdivision denial was unreasonable and arbitrary after having acknowledged that there was no evidence on that point. So that in itself is reversible error. You cannot – you cannot invalidate a presumptively valid zoning or subdivision regulation without evidence. Here, the court had a lot of evidence, which we disagree with, and I'll get to that as time permits, on the zoning. But there was no evidence on the subdivision. And the court, therefore, could not find that the subdivision denial was invalid. And, therefore, the court could not find that it was a reasonable plan when it facially violated the subdivision code. And the court, therefore, could not find, consistent with the Sinclair case, the Pillman case, and numerous other cases, that an unreasonable plan, i.e., one that violates the law, can be substituted for the zoning, notwithstanding the illegality of the underlying zoning. To prevail in the zoning case, they had two essential things to show. One, that the underlying zoning decisions were unreasonably denied. And we can test that, but even assuming that that point was made, the other thing they had to show was that the plan was reasonable on which the development would be pursued. And for a plan to be reasonable, it can't be illegal. And this plan plainly, explicitly, and materially violates the subdivision ordinance, an issue that plaintiffs brought into this case at the very filing of the complaint. And the fact that they failed to present any evidence challenging the subdivision denial is not a matter that we didn't raise the issue. The issue was raised from day one. It is an issue of whether or not there was evidence to support the invalidation of the subdivision denial. And there was not any evidence at all. As a result, the subdivision denial is presumptively valid. And there was no evidence to contradict that. The trial court found otherwise. That is reversible error. Let's turn to the zoning issues, because that was the bulk of evidence at the trial. Do you concede that all of the LaSalle-Sinclair factors weighed in favor of the archdiocese except for three and four? I would say that this development plan met many of those LaSalle factors. But the LaSalle factors are not a checklist. They are aids to figuring out whether substantive due process has been met. In this case, as we've seen in Illinois cases before, when traffic is a matter at issue, traffic itself. Can be sufficient to deny a plan. Exactly. And the court, in looking at the evidence, determined that one traffic expert was more credible than the other. And really, isn't Libertyville asking us to re-weigh the witness' credibility? No. In fact, Judge, I would let you use just the plaintiff's evidence. Because listen to what the plaintiff's evidence was. The plaintiff's evidence was that the existing level of service at the proposed entry was level of service F, which is generally regarded as an unacceptable level of service. They further said that the development proposal had no traffic improvements, no traffic safety improvements, that will enhance that. The only thing it will bring is more traffic. They also said that the addition of a traffic signal at Butterfield and Lake would do nothing. May I finish? Yes, go ahead. Would do nothing for this intersection. They also said that the lowest satisfactory level of service for this area would be D, as in dog. And finally, they noticed that the original development plan, with the secondary access, would improve traffic conditions appreciably. Based on the Pillman case and other cases, showing that there is an alternative plan which is preferable is enough to show that the development plan is not reasonable. And as a result, that is reason enough to uphold the zoning decisions, even if the underlying zoning may not have complete validity. Lake County made a preliminary determination here, did they not, that the proposed unsignalized intersection did meet the county standards and was safe and effective. And the county engineer also said that the original development plan was far preferred. It was a far safer intersection plan. You said the plaintiff's evidence showed that putting a light at Lake and Butterfield would have no effect on the delays at this intersection. Their traffic impact study said that it would have minimal impact on the level of service at that intersection. What about Abuna's testimony? I'm sorry? What about Abuna's testimony? Didn't he say that the average seconds of waiting would go down from 81 to 64? But it wouldn't change the level of service. It would change it to an F. Well, he didn't say it was unacceptable. He said that the satisfactory level would be D. And he said it won't get over F. Maybe I'm wrong, but I'm driving here on Lake Street. I must have passed hundreds of F intersections. I mean, because that's a street that carries 20,000 to 30,000 cars or whatever the heck it is a day, and any non-signalized left turn coming onto Lake Street would be an F, wouldn't it? I don't know. I'm not a traffic engineer. I'm looking at what they testified. What I will say, Justice, is that the decision of the village board is really one of whether or not its decision is consistent with the substantial consideration of public health, safety, and welfare. There is no question that adding traffic at an already overtaxed intersection is not going to enhance it. There is no question that had the original development plan, which plaintiff had complete control over the property, been implemented and they proposed it, had they done that it would have had the beneficial impact on traffic. And so based on the case law under Pillman and drawing a blank as to the County of Cook case, but on those cases the court made it clear that if there is an alternative development plan that would have a better result, that that is reason enough to say that the proposed plan is not reasonable for purposes of granting zoning relief. In this case, it's even more significant. Why? Because the revised development plan was an express violation of the subdivision ordinance. And as such, it cannot be a reasonable plan. Here the board never even reached the question and the decision of whether the proposed development would comply with the village's technical regulations because they denied the rezoning that would permit this development. So there wasn't even a decision below with respect to this before it got to the trial court. Judge, I would respectfully disagree. There was an express motion of the village board, it's in Exhibit A of the complaint, in which they expressly considered the approval of the preliminary plan and unanimously denied it. I can't tell you, nor do any of you know, nor anyone in this room know why they denied it, but clearly one of the bases that is justifying that denial is the noncompliance with the subdivision ordinance. And that is a presumption that can be made and should be made in support of the subdivision denial, which in turn prevents the zoning relief to be granted. Thank you. You'll have time to respond. Good morning. The village's argument overlooked one critical and, frankly, dispositive matter with respect to the subdivision ordinance claim, and that is the fact that this was a planned development. What's a planned development? A planned development in the village of Libertyville is a mechanism by which the applicant, property owner, developer, and the village effectively negotiate a development. And in that negotiation of the development, what occurs? This is out of the village code. What occurs is in order to accomplish the efficient use of land one creates smaller networks of utilities and roads. That's a quote. One of the other things that occurs in a planned development is there's an increase in the amount of open space over that which would result from the application of conventional subdivision and zoning regulations. So does it essentially, a planned development, invoke the discretion of the municipality to overlook some of the zoning ordinances and technical requirements? That is exactly not only what allows them to do it. That's what's contemplated and expected, and that's what occurred here. The village says in its brief they mentioned the alleys. Well, yes, the alleys do indeed. They are narrower than a street. If one considers them a street, they are too narrow. Why would one allow alleys? Because there are no driveways. That's the tradeoff. There were no driveways. In order to access one's residence, one, you access from the alley, in effect a common driveway, and you have rear-facing garages. That's the tradeoff. You've got more open space, you've got more green space, you have more community areas. That's what was reflected in the plan. The lots are narrower. Yes, they are narrower than would be otherwise required in a conventional R6 subdivision. Why do you allow that? In order to do as this plan did, create more green space, open space, of which there were seven park areas, six park areas, and one conservation area of seven acres. Did the village challenge any of this at the hearing? The village not only didn't challenge it, they complimented it. Their Director of Community Development's staff report, which was confirmed on the stand when he testified as the village representative, that this was a creative, unique, and necessary development to add to the village's existing housing stock. Did you seek at the court order the village to approve the preliminary plan? Your Honor, again, in the plan development section, Article 16 of the village code, it requires that the subdivision plaque be reviewed simultaneous with the concept plan. And the concept plan is what the code calls the plan that's submitted in order to obtain approval of a planned development. Why does it do that? It does it in recognition of the fact that the preliminary plaque is going to have to tie to the concept plan because of those deviations. They are linked together. They are reviewed and adjudicated by the village simultaneously. If you think about it, if the concept plan is approved, which provides for variations from otherwise applicable technical requirements of the subdivision code, that's got to be shown on the preliminary plaque. You can't have, as the village is asking this court to do, to reinvest them with subdivision authority then we go back to the village. Now they have the ability to strictly apply the subdivision requirements to a plan that was developed, contemplated, and blessed as having deviations from the subdivision code. The deviations account for the trade-offs, the give-backs by the property owner developer, here the archdiocese, to the village to have all of this open space, all of this creativity, all of those things that made this a plan that the village endorsed in all respects. Well, you said they endorsed it in all respects, but then they denied the ordinance to approve it. For one reason, Craig. The assertion that the access point provided for was unsafe. But the evidence demonstrated otherwise. The evidence was conclusive otherwise. The ruling was a package deal, as we talked about before, that is tying in the zoning and the plot of subdivision, but focused on the issue of traffic, ingress and egress. That's what the village code requires. So it's not my view that it was a package deal. The village code in its planned development section of its ordinance, Article 16, requires that package deal. So when the question is asked, I think it was you, Justice Burke, said, so this claim that it violates the subdivision ordinance, did everybody just overlook? Did the trial judge in the 35-page opinion just overlook these violations with the subdivision ordinance? Did the plaintiff, in putting on its case, simply overlook the adherence to the subdivision ordinance? Absolutely not. But in a planned development, you kind of step out, not kind of, you step outside the technical requirements of the subdivision ordinance, and you talk about this plan, this unique developed plan with give and take, which accounts for something, which, according to the village, was unique and creative and would have added to the village's existing residential developments. But for this one single issue, which I would submit to the court, was thoroughly dismantled during the trial, recognized by the trial court, to the extent that the trial judge made a specific finding that he found the village's traffic consultant who was relied upon for this evidence to be not credible. And he was not credible not because of how he presented himself. That which he relied upon was simply not reliable. This unnecessary, inappropriate focus on this one single data point to the exclusion of all others which pointed in the opposite direction, that this was, as the county determined, the county being the one with jurisdiction to grant access permits to Butterfield Road, the county determined, and the county chief engineer testified that the access provided not only met the strict requirements of the county ordinance, but it was, in her words, quote, safe and effective, end quote. And now is it? Would you agree that the alternative plan that was put forth in the first application completely resolves this issue of safety at that intersection? No, I don't. At which intersection, Your Honor? At the one that's at issue in this case. It doesn't. Because keep in mind, that initial plan had that... Had both, I know. Yes, had Butterfield Road to the north as being an alternative secondary access. The other access was still provided. The one complained of here was still in existence. But most right-thinking people who were trying to make a left-hand turn would seek out a right. During Russia. If they needed to. And therein lies the rub. A, if they needed to, certainly it would be available to them, and they may use that particular intersection during that peak morning hour more so than they would the unsignalized intersection. I would say that would be a reasonable assumption. But the question isn't whether or not that would have provided some attractive relief for traffic seeking to exit the subdivision during peak hours. I can't deny that. However, however, was it necessary? Does that absence of that secondary point of access render that which was proposed unsafe? And the answer is conclusively no. Moreover, at what cost do you require that secondary access? One of the losses to the village when the plan was changed to eliminate that secondary access is the developer would no longer be tagged, if you will, with the financial responsibility to put a light in at Lake and Butterfield. However, the archdiocese, the developer with the archdiocese approval, confirmed the trial, said, nevertheless, we will pay for... The testimony is this is a half a million dollar item. It is not an insignificant expense. Nevertheless, that light will be provided at Lake and Butterfield, notwithstanding the fact that whatever problems exist at that intersection prior to the development had nothing to do with the development. That was a pre-existing difficult situation. The other point I would add is Lake County testified that given the proximity of these two access points, existing Lake Butterfield and the proposed new access point, there was only and ever going to be one light. So the light is going or would go if this development is allowed to move forward. The light will go at the intersection where it's needed the most. Is it not significant that this point of egress and access had a level of service F? It is a data point, but for an unsignalized intersection, the Highway Capacity Manual, which is the Bible on this issue, the Highway Capacity Manual makes clear that level of service grades for unsignalized intersections are simply a measurement of time, as opposed to level of service grades for signalized intersections provide qualitative reference. In other words, if you have a signalized intersection and you get an F, that means that it is an unsafe intersection. That is not true with an unsignalized intersection. It is simply a single data point measuring the fact that it will take more than 50 seconds or at least 50 seconds in order to make a left turn out during that single peak hour. That's all it means. So it's a data point. It's not an insignificant data point, but that data point has to be reviewed in the context of all of the other data points which pointed in the direction of it is a safe intersection. What's a safe intersection when we talk about unsignalized access? Are there gaps in traffic that would allow a safe movement out, that left turn? The evidence showed that there would be 33 cars making the left turn out in that key morning hour, and there was enough gaps in traffic, according to the GAP study, which is an actual physical count, an independent study, enough gaps to move four times that many cars out during the morning peak hour. The point is, when you take all of the data together, you look at it holistically, you only reach one conclusion. The same conclusion Mr. Rabuna testified to, the same conclusion that the county blessed, it is safe and effective. The council seems to be arguing that if there is an alternative plan that's better, that kind of takes the day on whether or not the bill was acted unreasonably arbitrarily. I have two responses. One is, when isn't there something that's better? When can't you look at a development plan and say it can be improved, we can add more in open space, more or less units, depending on what side of the fence you're on, more parks, less parks, depending on what side of the fence you're on. So the answer is, is there something better, is really irrelevant. What is important here is that this particular plan, in consideration of all of the factors, the balancing that occurs, the fact that the developer is seeking a number of units that's 25% less than allowed in the R6 zoning district. Typically when you have planned developments and you're shrinking the size of the lots, you're shrinking the size of the lots in order to do what? Create the opportunity for more units, more density than is otherwise required. Here we only have less lots, fewer lots, smaller lots, in order to create that much more open space, that many more parks, and 25% fewer units than is otherwise provided in the R6 zoning district. At the end of your prayer for relief, when you asked to order the village to allow the plaintiff to develop the subject property consistent with the uses and site plans set forth in the application, were you not asking for a mandamus relief? No. What we're asking for, and it's consistent with what the law allows, the development plan, just keep in mind, the way this is reviewed and the way legal rights are conferred, and here reviewed, is in the context of a concept plan. That's what it's called, a concept plan. So we haven't buttoned down all of the particulars of that plan. Courts aren't in the business of applying subdivision ordinances to technical requirements. So what that prayer for relief asks for and what the court ultimately found is that the concept development plan is, if you will, imposed on the property subject to what? Subject to reasonable conditions. Are those reasonable conditions found in the zoning ordinance? They could be. Are they found in the building code? They could be. Are they found in the subdivision ordinance? They could be. As long as those conditions are reasonable and don't impair the integrity of that which has been imposed and is reflected in the concept plan, then they're reasonable. It's mentioned in the brief, there were 50 conditions that were identified that would have applied to this development concept plan had it been approved. Of the 50 conditions, each and every one of those 50 conditions was agreed to by the owner. The archdiocese agreed to every one of those 50 conditions. So hypothetically, if we're to go back and this court were to affirm that the development is going to proceed, while it's possible that there could be some contest with respect to some of those conditions, I would suggest to the court that the record shows that most, if not all, of the conditions have already been, A, identified, and B, agreed to. Thank you. Thank you. Thank you. Thank you, Justices. Mr. O'Donnell points out that the application was a planned development. It was. And in fact, Illinois law is very clear that a planned development does involve both zoning and subdivision. But in the Champaign v. County of Urbana case, you may have heard that word, my apologies, the Illinois Supreme Court made it very clear that satisfaction of zoning does not in any way absolve someone from satisfaction of subdivision. It can be done, but it's not an automatic thing. What we have, and Mr. O'Donnell admitted that the subdivision, that the revised development plan does not conform with the subdivision ordinance. And it provides, under the planned development ordinance, an opportunity for discretion over whether to overlook or vary certain requirements of subdivision. And that they're to be reviewed simultaneously. But the simultaneous reviewing of the subdivision and zoning plan doesn't put the subdivision ordinance in derogation to zoning. Both of them stand alone. Both of them have to be complied with. Those compliances, in some instances, where, in plaintiff's parlance, there's a deal negotiated, involves a give and take, where there's a variance to the subdivision. But it doesn't entitle someone to a subdivision variance. In this case, plaintiff is asserting that they're entitled to variances from the subdivision. But they never put any evidence on to support that. The village board decided it was not going to approve the preliminary plan of subdivision. Why? I can't tell you. The zoning was denied because of the intersection, right? That's why the zoning was denied. I think in the totality of things that the village board found, and again, the standard is whether or not a decision bears to the public health, safety, and welfare. The village board received, and it wasn't just any plan, the village board received a plan from the plaintiffs that said, here's what we're going to do, and that was a better plan. Because of the traffic issue. It was not any other issue. It was because of the traffic issue. It was because the development plan was not providing the benefit that it otherwise has the ability to provide, and it could be approved upon. The village in a plan... Why can't we just say that, or infer, reasonably infer that the denial of the application was due to the zoning denial? I don't think that that's a reasonable inference when you have facial and significant variances from the subdivision. What about the testimony that the village agreed that the plan was creative, unique, and necessary? Oh, plenty of things can be creative and unique. The necessity of it was... Plenty of things can be, but we're talking about this specific goal. But that was a staff determination, not a village board determination. The only evidence we have as to the village board's determination is its vote. That's how the village board makes its decision, and its vote was unequivocal. It was a unanimous vote to deny the subdivision approval. How can we know that this doesn't comply with the subdivision code? Because the subdivision code... We have to read the subdivision code. We have to apply the code to the evidence. I mean, we're not the trial court. Why would we be doing that? Because it's on its face. Invalid. The plaintiff's counsel just admitted that it doesn't comply. I don't think that this requires any kind of fact-finding of any independent nature on the fourth part. It's plain on the face of the plaintiff's counsel. No, the issue is whether the record is developed on that issue. I mean, if it's never presented to the trial court, the trial court never rules on it, and then all of a sudden it comes up here and it's an issue where it's never been an issue before. It was an issue from day one. They challenged the denial of the subdivision. How did the village make this an issue other than putting it in... other than answering the complaint or the pleadings? How did the village make this an issue? I mean, it wasn't even in the motion to reconsider. It wasn't even in writing. I agree. But the village denied the allegation that the subdivision denial was improper. Okay. And in doing so, it made it an issue. At that point, that burden became plaintiff's. They never brought their burden forward, so we had no obligation of going forward either. But there's an issue of forfeiture, though. If you don't raise an issue in defense, it's forfeited. They have the burden of proof. This was not a defense. This was a matter of they had an affirmative allegation that the subdivision denial was improper. They had the burden. If they do nothing, we have no obligation to do anything. No, but don't you have some obligation to at least clue the trial court in after all the proofs are done and say, Judge, they didn't prove this element? And that's what was raised during the argument on the motion to reconsider. Again, during the argument on the motion to reconsider. Forfeited. If you don't raise it in the closing argument where the trial judge can say, hello, there's an issue. There's an issue that I now have to address in my 40-page memo. But he didn't because, and his ruling was, I never heard of this before. When he was ruling on the motion to reconsider, he basically said, this is new to me. Except for the fact that it's been part of the case from day one. Thank you very much, everybody. Court thanks both parties for the arguments today. The case will be taken under advisement. A written decision will be issued. Court stands in recess. Thank you.